FREDERIC W. STEVENS

*v.*

WILLIAM T. HEADLEY, WILLIAM V. V. LIDGERWOOD et al.

[Decided June 24th, 1905.]

1. In a suit to quiet title to certain land as against an alleged highway easement, evidence *held* to require a finding that defendant L.'s grantor and attorney, before purchasing his part of the land, had knowledge that complainant had bargained for another part of the whole tract, which included a part of the road in question, and was thereby put on inquiry as to the precise extent of complainant's purchase.

2. Where a map of certain lots in a city addition had never been filed in any public office, and part of a road on one side of the plat in dispute had never been worked, accepted or used by the public, the right of the owner of a lot abutting on such alleged road, which ended in a *cul-de-sac*, to have the same kept open, was at most a mere private right of way appurtenant to the lots conveyed to him.

3. Easements of private way are not the subject of possession, but lie in grant, and hence can only be created by express or implied grant, by adverse user, or by estoppel.

4. Certain deeds of lots which abutted on a road ending in a *cul-de-sac* referred to the road "laid out across the whole tract," and contained covenants on which the grantors bound themselves and their heirs and assigns not to erect or permit to be erected on the property owned by them adjoining the property conveyed any house costing less than $5,000, or nearer than forty feet from the street [road] line.—*Held,* that such covenants were personal to the grantees, and did not extend to the benefit of subsequent purchasers of other lots.

5. A declaration, in deeds to certain lots abutting on a highway, laid out, but not open, that the same shall remain open and be used 'as a public road by all persons desiring to use the same, can operate only as a private covenant to the several grantees or as a dedication which can be only made available to third persons by acceptance by the public.

6. Where a deed to certain land abutting on an alleged private road contained a building restriction prohibiting the erection of buildings nearer than forty feet to the northwesterly side line of such road, the deed did not by implication convey any right of way over that part of the road ending in a *cul-de-sac*, which was beyond the property conveyed toward the closed end of the road.

7. Where a grantee of certain land abutting on a private way would not be injured by the closing of the way beyond his property and toward the end of the road in a *cul-de-sac*, he was not entitled to object that the owners thereof were estopped to close it.

8. The general rule is that a private right of way alleged to have arisen either by implication or by adverse user must be shown to have its termini either in land in which the party asserting it has some interest or in a public place or highway. It cannot be so claimed where one of its termini is a *cul-de-sac* in which the party claiming it has no interest.

On final hearing on bill, answer and cross-bill and answer.

*Mr. C. Franklin Wilson,* for the complainant.

*Mr. John M. Mills,* for the defendants William T. Headley and Helen T. Headley, the younger.

*Mr. Charlton A. Reed* and *Mr. Edward K. Mills,* for the defendant William V. V. Lidgerwood.

PITNEY, V. C. (called on for his reasons for purposes of appeal October, 1905).

The complainant, Frederic W. Stevens, by his (amended) bill seeks to enforce the specific performance of a contract in writing for the conveyance of land entered into by him with the defendants William T. Headley and Helen T. Headley, dated April 6th, and executed by the Headleys April 7th, 1903.

He makes the defendant William V. V. Lidgerwood a party defendant, because as owner of other land he claims an easement over the lands covered by the contract, and complainant prays that that claim of easement may be dealt with by the court and decreed not to exist.

The easement claimed is a right of way over a portion of the land comprised in complainant's purchase.

The defendants, the Headleys, answer the bill admitting the complainant's equities and denying that defendant Lidgerwood has any easement in the lands in question.

They add to their answer a cross-bill against Lidgerwood, praying that the land in question may be decreed to be free of any easement such as is claimed by Lidgerwood; they make Mr. Edward K. Mills a party to their cross-bill because the title to Lidgerwood's land passed from them to him and from him to Lidgerwood.

Mills and Lidgerwood answered the complainant's bill and Headley's cross-bill in one pleading, and without objection to the form of either.

The case was brought regularly to hearing on these pleadings.

At the hearing counsel for Lidgerwood took the preliminary objection to complainant's bill of multifariousness and misjoinder.

I overruled this objection on two grounds—*first,* that it was not taken in time, and *second,* that it was without merit.

The facts developed at the hearing are as follows:

The Headleys acquired title to the land in question by descent from their father, J. Boyd Headley, and hold it subject to the right of dower of his widow, Helen T. Headley, the elder (not a defendant).

The particular land in question is a part of a larger tract which may be, for the present purposes, described as a long, narrow strip of land about two hundred and twenty-five feet wide, with one end bounding on the southwesterly side of South street, one of the principal streets of Morristown. The annexed sketch shows as much of it as is necessary for present purposes.

It was formerly bounded on the northwesterly side for a few hundred feet on its South street end by the lands of the female seminary (owned by Miss Dana), and in the rear of the seminary lot it is bounded on that northwesterly side by land of the defendant Lidgerwood. On the southwest end it is bounded by lands of Mr. Foote. On the southeast side by other parties.

Its only connection with any highway is its junction with South street.

In the year 1897 the Headleys caused about two-thirds of this strip next to South street to be laid out and plotted on a map into building sites, and, with a view of their sale, caused a road to be laid out on the map from South street along and near to the southeasterly side of the tract, but not touching the same, and ending at the bottom of a steep bluff on their own land.

The reason for their stopping at this point with their scheme was that the remainder of the land, about six hundred feet in length of the strip, was low and flat and unfit for building purposes, except perhaps of a very cheap class of dwellings.

Over the part of the land here in question the lots were laid out about one hundred and sixty-seven feet in depth and seventy-five feet in front.

At the time of the making of the contract here in question they had all been sold and built upon from South street down the new street, except ten at the extreme end.

Of these, the three farthest southwest were, by reason of the configuration of the land, unavailable and unsalable as separate lots.

Of those that had been sold and conveyed the one farthest from South street was owned, built upon and occupied by Mrs. Romaine, whose husband, William J. Romaine, was a real estate agent, and had the lots in his hands for sale on behalf of the Headleys, who lived in a suburb of Philadelphia.

The Headleys had blue prints of their map made and circulated for use in selling, but they had never filed it in any public office.

This blue-print map did not include the whole tract, but only so much as covered the road and lots facing on it.

As before remarked, the road (called Headley road) is laid out wholly on the lands of the Headleys. It kept some fourteen feet away from the southeasterly side of the tract, and ended, so to speak, in the midst of it.

The Headleys worked and graded on the ground about one thousand four hundred feet in length of this road, stopping at the top of the bluff, from whence the land descended rather abruptly and irregularly to the lowland before mentioned, leaving about two hundred and fifty feet of the lower end of the paper road untouched and unaltered and covered with a thick growth of small trees and brush.

No part of the road was ever accepted or worked ·by the municipal authorities, and it was never used by the public beyond the residence. of Mrs. Romaine.

Over that part of the road which is here called in question there was growing brush and small saplings.

The Headleys, in making conveyance of lots, mentioned the Headley road, and inserted, in several instances, a limitation against building nearer than a certain number of feet from the side of the road. These allusions to the road will be referred to farther on. No mention was made of the map.

The complainant in the latter part of the year 1902 opened negotiations with Mr. Romaine for the purchase of the southwest end of the whole tract, including about four and one-half of the most southwesterly of the lots laid out on the map, of which about seventy-five or one hundred feet (defendant's surveyor says eighty-four feet) faced on the road as actually worked on the ground. The negotiation included all of the road as laid out on the map within those lines. The quantity in the tract so negotiated for was five acres, and its northeasterly end was roughly marked on the ground by a stake set up, and in due course it was surveyed and a description thereof made. The beginning point was four hundred feet southwest from Mrs. Romaine's lot.

This lot would give the complainant a large building site on comparatively high ground with an outlet to South street over Headley road.

As I interpret the evidence the parties came to a substantial

agreement on the 21st of January, 1903.   This is fixed by a letter from Mr. Romaine to complainant of that date.   But owing to the necessity of measurements on the ground and other details, the agreement (set out in full in the bill) was not finally settled and executed until April 7th.   Judge Vreeland, who was counsel for the Headleys, prepared an agreement in March and sent it to them, and it was by them recast and executed on that day, April 7th, and forwarded to Judge Vreeland.

This sale left still belonging to the Headleys four hundred feet of frontage on Headley road, or a little over five lots, seventy-five feet front each, between the complainant's lot and the Romaine lot.   Hence the contract contained a restriction against the complainant building on his lot nearer than twenty-five feet to the northeasterly front of it and against the Headleys building on their remaining lots nearer than forty feet to the Headley road.   It also provided for a right of way from the lot to be conveyed to South street by the Headley road, which is described by metes and bounds.

It also contained the following significant clause:

"And the said Wm. T. Headley and Helen T. Headley the younger hereby further agree that they will procure the execution and delivery to them by all the owners abutting on what is known as the 'Headley road' of a release of any and all right, title and interest of such abutting owners (if any) of, in and to any right of way or easement over the lot hereby agreed to be conveyed, or any part thereof."

The Headleys anticipated and encountered little difficulty in procuring these releases, because the parties interested would at once infer, and could be assured that the complainant purchased for the purpose of erecting a dwelling for himself, which would result in insuring the permanent character of the neighborhood, and in cutting off all danger of the low flat land on the southwest end of the tract being devoted to the erection of cheap cottages for laborers, whose existence along the possible extension of the Headley road would, to say the least, not increase the desirability as residences of the high-class dwellings already erected on that road.

Such a use of that low land was contemplated by the elder Mrs. Headley, and was an obstacle in the way of her joining in the conveyance to the complainant, and this was known to Mr. J. H. Lidgerwood, the brother and agent of the defendant W. V. V. Lidgerwood, as early as February 27th, 1903, as appears by his letter of that date to his brother, the defendant, who was a resident of London.

In the meantime the defendant Lidgerwood, who, as we have seen, owns the land on the northwest side of the Headley tract, commencing in the rear of the seminary lot, instructed his brother, John H. Lidgerwood, a New York business man, residing in Morristown, to open negotiations for the purchase of the two lots (Nos. 10 and 11) next adjoining Mrs. Romaine's.

His object in doing this, as declared in his testimony (taken by commission) and explained at the hearing by a map, was to obtain access from his land to South street by way of the Headley road. Besides, his land immediately adjoining those two lots is high, and would make a valuable addition to them, and the union of his land and the two lots (10 and 11) would greatly increase the value of each, especially the high land of Lidgerwood, which is small in extent and area and so situate as to be of little value by itself.

Mr. John H. Lidgerwood employed for this purpose the defendant Edward K. Mills, who opened negotiations at once with Mr. Romaine. Throughout their negotiations they used a blue-print copy of the original map and also a vellum copy of it produced by Mr. Mills, which showed a slight variation in the lines of the lots as laid on the original map, which had to be observed in locating the two lots for which Mr. Mills was negotiating.

The only obstruction to an immediate sale to Lidgerwood was the price demanded by the Headleys, viz., $9,000 for the two lots. Mr. Mills offered $6,000.

He negotiated entirely in his own name.

The first interview between Mr. Mills and Mr. Romaine, the date of which is recollected by Mills, was on the 21st of February, 1903. On that occasion Mills swears he first heard of the Stevens' purchase verbally concluded a month before. He

then, as he says, heard from Romaine that Judge Stevens was negotiating for a lot of·five acres at the lower end of the property at a price of $5,000. And on his (Mills') hinting that he thought the price was low Romaine answered "Yes, but we think it will be a good thing, it will establish the property," and added that he was afraid the sale would not go through, because the elder Mrs. Headley would not consent to such a low price, because she thought she could get more money by selling off lots to different purchasers rather than the whole thing in a lump.

Here we have the exact amount of land purchased by complainant stated by Romaine, and we also have the origin of that part of the letter from John H. to the defendant Lidgerwood, dated February 27th, 1903, in which he says:

"Old Mrs. Headley refuses to sign. She has a dower right. She refused to sign Vice-Chancellor Stevens' purchase, which was the last lot on the road, $6,000, and the swamp lots, because the swamp lots were not plotted in city lots and sold for $500 each."

And again, on March 3d, he wrote to his brother, "All waiting now on Mrs. Headley, Sr. She refuses to make title to Chancellor Stevens who has bought 120-foot lots and some swamp, $6,000." The mention in this letter that Stevens' purchase included "120-foot lots," which must have meant front on the road, is significant when we consider that Mr. Lidgerwood and Mr. Mills, from·whom he got his information, probably had in mind the frontage on the road as worked on the ground, which we have seen did not extend by two hundred and fifty feet to the end of the road as laid out on the map. Indeed, the defendant, Lidgerwood's, surveyor, by a recent measurement, makes the complainant's frontage on the street, as worked on the ground, to be only eighty-four feet. I am unable to perceive how this idea of "120-foot lots" could have been obtained by Mills unless he either went on the ground and made a measurement and personal inspection, or that Romaine pointed out to him on the map the place to which the complainant's land would extend, and this was easily done by showing on the map where com-

plainant's land would commence, namely, as stated in the agreement, "400 feet southwest of Mrs. Romaine's lot."

The inference which I draw from the whole evidence up to this time, February 21st, 1903, including that of Mr. Mills, is that on that day Mills was informed by Romaine of the verbal agreement of purchase he had a month previously concluded between the Headleys and complainant, and that the only obstacle to its complete execution was the objection of the widow to join in the deed, and that Mr. Mills was then informed with approximate accuracy of the extent on the ground of the complainant's purchase.

The parties, Romaine and Mills, proceeded with their negotiations, being divided only as to price.

On or before the 20th of March Mills procured from Romaine a verbal option on his proposed purchase at $9,000. On that day (so his diary shows) he examined the records for conveyances and for building restrictions and the like, and there found the restrictions and references to Headley road previously mentioned, and at once told Mr. J. H. Lidgerwood that if he took title to the lots he must come under a restriction not to put a building on the lots nearer than forty feet to Headley road.

Nothing was at any time said between Mills and Romaine on the subject of restrictions or rights of way or the like. They finally, on the 4th of April, agreed on $8,500, and proceeded together to the office of Judge Vreeland, who was counsel for the Headleys, to arrange for the carrying out of their contract.

It must be borne in mind here that Judge Vreeland had recently drafted and forwarded to the Headleys for approval and execution the contract between the Headleys and the complainant. The result of the conference was that it was concluded that there was no occasion for a written contract, but that he, Vreeland, would prepare and forward promptly to the Headleys the deed for execution.

It is plain from the contemporaneous letters from John H. Lidgerwood to his brother, the defendant, that he was in doubt whether the elder Mrs. Headley would unite in their deed.

On that date, April 4th, Mills prepared a receipt to be signed by Miss Headley, as follows:

"April 4, 1903—Received from Edward K. Mills, a certified check for five hundred dollars, being part payment of the purchase price of eight thousand five hundred dollars for lots 10 and 11 of the Headley tract (being 150 feet on Headley road next to W. J. Romaine's lot), which the said Edward K. Mills has agreed to purchase at the price above named ($8,500) and Helen T. Headley to sell. (Signed) Helen T. Headley, Jr."

I can only infer from the omission of the name of William T. Headley as a vendor in this short contract that Mr. Mills was in haste about getting a binding contract and was unwilling to wait to get the signature of William T. Headley, whose business appears to have called him away from home at times. Be that as it may, the check and receipt were forwarded to Miss Headley and returned promptly duly signed by her and the check was endorsed by her and her brother, William T. I recollect no evidence as to the exact date when this receipt was signed by Miss Headley. April 4th was Saturday. The complainant's contract is dated on Monday, the 6th, and was acknowledged by the two Headleys, brother and sister, in Philadelphia on the 7th, so that so far as the execution of a binding contract goes I conclude that the parties stand on an equal footing as to time.

Much testimony was given as to what occurred in the way of conversation in Judge Vreeland's office on the 4th of April, and it is somewhat conflicting. It is conceded that one or more copies of the blue-print map were on Judge Vreeland's table. Judge Vreeland and Mr. Romaine both testified that Romaine then and there pointed out on the map to Mr. Mills in a general way how far to the northeast the complainant's purchase extended. Mr. Mills is emphatic and positive in denying this testimony. Each of these witnesses is entitled to complete credit. Judge Vreeland and Mr. Mills are known to me personally to be so entitled to it. It is my duty to reconcile the evidence if I can. I think the probability is that what was said and done in that respect made so little impression on Mr. Mills' mind that it has escaped his memory, and for the simple reason that he was not interested, either personally or on account of his client Lidgerwood, in the precise point or limit on the northeast of the complainant's purchase. The evidence of the defendant Lidgerwood, which was taken by commission, in connection with the letters written to him by his brother, show that

what he had in mind mainly was access from his large tract of land to South street over the Headley road, and that he had little or no interest in the extension of that road upon the Headley land to the southwest of the two lots he was trying to purchase.

I feel constrained, then, to hold that Mills, before he paid his money on April 4th, had direct notice and knowledge that complainant had bargained for a part of the whole tract which included a part of the road in question and approximately of its extent, and that he was thereby put upon inquiry as to the precise extent of that purchase, if it was of any consequence to his client, but I believe that the precise extent was pointed out to him on the map.

But it may be argued that the fact that defendant Lidgerwood, through his agent and counsel, is chargeable with notice that complainant's purchase included a portion of the southwest end of the road as laid out, and the lots facing thereon, did not necessarily indicate that he intended to close the southwest end of that road, even if he had a right to do so.

Let us consider this suggestion. The width of the whole tract is about two hundred and twenty-five feet (I believe the lines are not precisely parallel).

This width was divided where these lots in question were laid out, into one hundred and sixty-seven feet, more or less, for the depth of a lot, forty-five feet, more or less, for the width of the street and fourteen feet for a strip of land between the road and the southeasterly side line.

Now, it seems to me, the question at once suggests itself, would the complainant contemplate or entertain the idea for a moment of building a dwelling on the comparatively small piece of high ground on the northeast end of a tract one hundred and sixty-seven feet wide and nearly one thousand feet deep, with a public road in existence forty-five feet wide passing near to his house and ending in his ground in the rear thereof? It seems to me that the question answers itself.

But to return to the subsequent events. Judge Vreeland shortly after April 4th prepared the two deeds for execution and sent them in one envelope to Philadelphia. I infer the dates

were left blank. It was in that to complainant. The original deed to the defendant Mills was not produced. That is dated the 16th of April and executed and acknowledged on that day by the elder Mrs. Headley and by the brother and sister Headleys and the wife of the brother. It was promptly returned to Judge Vreeland. The deed to the complainant, with the date in a different handwriting, is dated the 29th of April, and was executed by William T. Headley and wife on that date and returned to Judge Vreeland unexecuted by the other Headleys.

Undoubtedly the brother and sister encountered difficulty in inducing their mother to sign it. She did finally unite with her daughter in executing it before Judge Vreeland in Morristown on the 15th of May.

In the meantime the deed to Mills had remained in Judge Vreeland's hands undelivered.

The parties are not agreed as to the cause of delay in its delivery. Mr. Vreeland and Mr. Romaine and William T. Headley understood that Mills' was unwilling to accept his deed and pay for it until after Mrs. Headley had joined in executing the deed to the complainant. Mr. Headley is very emphatic on this subject. They seemed to have understood that Mills did not wish to carry out the contract unless the danger of the lowlands being devoted to laborers' cottages was substantially removed by the sale to complainant.

On the other hand, Mr. Mills understood that the delay was for the benefit and accommodation of the Headleys in order to enable them to constrain their mother to join in the deed to complainant, and in this he is supported by letters written about that time by Mr. John H. Lidgerwood to his brother in London.

I deem it of little importance to determine this question since the fact was that the delivery of the deed to Mills was delayed until that to complainant was executed, and as soon as the complainant's deed was executed, to wit, on the 16th of May, Mr. Mills was notified of its execution, and immediately called on Judge Vreeland, paid the balance of his purchase-money, took his deed and had it recorded and promptly executed a deed from himself to William V. V. Lidgerwood.

At the date of the delivery, so far as appears, nothing was

35

said between Judge Vreeland and Mr. Mills as to this right of way, and this seems somewhat strange, because Judge Vreeland was well aware of the clause in complainant's contract requiring releases from each of the other property-owners on the street, and those releases had been prepared by him or by one of his firm, and work was being done industriously in procuring the signatures of the various releasors, the accomplishment of which was delayed by reason of the absence out of the country of some of the parties.

Judge Vreeland explains this apparent oversight on his part by saying that he supposed that it was all understood by Mr. Mills, as I am satisfied it was, and that no release from him was necessary. But, being reminded by complainant of the strict terms of the complainant's contract, he, within two or three days, prepared a release to be executed by Mr. Mills and asked him to execute it. This Mr. Mills expressed himself as being personally entirely willing to do, but that he had already conveyed the property to Mr. Lidgerwood, for whom he was acting as agent in the matter, and offered to forward a release to Mr. Lidgerwood to be executed by him. Such a release was prepared and either revised or redrawn by Mr. Mills and forwarded to Mr. Lidgerwood, who declined to sign it. Hence this suit.

Upon this part of the case I am of the opinion that complainant's equity is superior to that of defendant.

Let us now inquire into the validity of the defendant's claim as evidenced by the various deeds, including that to Mills, upon which he relies.

Since the proof is clear that no map of this property showing the road has ever been filed in any public place, and as that part of the road which is here in dispute or any part of it has never been used by the public or worked or accepted by it, it follows by the clear settled rules of law that any right which the defendant Lidgerwood has in that part of the road here in question can be no more than that of a private right of way appurtenant to the lots conveyed to him. I deem it unnecessary to cite authorities to sustain this plain proposition.

Now, the familiar rule is that easements of a private way lie in grant and are not the subject of possession, hence they must

be created by a written grant or its equivalent. This may be by express grant or by implication, as in the case of a way of necessity, or by long adverse user, which for the sake of consistency was always supposed to arise out of a lost grant, or a right of way may be created, so to speak, in equity, by an estoppel, as where a party so acts as to lead another to believe that a right of way does exist, and that party has so far acted upon it as to render it inequitable for the other to deny that the right of way exists.

One quality of a private right of way is that it must be from somewhere to somewhere. Thus, by the ancient rules of pleading in pleading a private right of way, the pleader should state the *terminus a quo et ad quem* of the way. *Gale Easem. 416.* It must lead from some place to some place.

Chief-Baron Comyn (*3 Comyn 56, tit. "Chimin"*) says:

"A private way is such as goes to a church, house, villa or close, and is not common for all the king's subjects. So it may be from a meadow or close to a street or to a highway. So it may be from one part of a close across the ground of another to another part of the same land (close). But a man cannot have a way from one part of the land of another to another part."

And the same learned author (*1 Comyn Dig. 284, tit. "Proceeding in an action for a disturbance"*) says:

"The declaration ought to show the certainty of the thing in which the disturbance is alleged, as in an action upon the case for stopping his way, it ought to allege the terminus *ad quem* the way goes, and likewise the terminus *a quo*, so if the plaintiff prescribe for a way to such a close *he must show a title* to the close, otherwise if the way claimed be to a high street, or to a common field."

And he refers in support to the case of *Parker* v. *Newsham, Lat. 160,* the translation of which is as follows:

"In an action on the case for stopping a way which the plaintiff had from a certain place across B acre, where the nuisance was, to a certain field. That is good without showing what interest he had in the field, because it shall be presumed it was a common field. Otherwise if it had been to such a close. There he must show what interest he had in the close."

Comyn also cites *Alban* v. *Brounsall, Yelv. 163; S. C., 1
Brownl. 215,* which was an action of trespass and a plea of a
right of way by prescription, and at *p. 164* we find this "the
prescription is not good because it is not shown *a quo loco ad
quem locum* the passage or way is."

It may be assumed that in these two cases the easement was
based on either implied grant or long adverse user, especially is
it probable in the case reported by Latch, which holds that the
party must show some right or interest at each end of the way.

It may be conceded that a right of way ending in private
grounds may be created by express grant where the grantee has
no interest in those private grounds. But the necessity for a
legal interest on the part of the person claiming the right in
each end of the way as claimed, except where it is a public place
or highway, is, as I understand the law, a necessary ingredient
in the element of adverse user or mere implication in such cases.

This principle was, in substance, acted upon as to public
rights of way in the very recent case of *Attorney-General* v.
*Antrobus, L. R. 2 Ch. 188 (1905).* There the attorney-
general of England attempted to prevent the enclosure by the
owner of the fee of the famous Stonehenge, on the ground that
the public had enjoyed free access to it from time immemorial.
But it was held that the public had no right in that great
curiosity, and that the mere visiting of it for curiosity by
numerous people, using, however, a definite route, must be pre-
sumed to have been with the permission of the owner. The
court held that there was no such thing known to our law as a
subject-matter of a grant or prescription as a *jus spatiandi* or
*manendi.*

Let us now see what language is found in any of the deeds
executed by the Headleys.

The first is Headley to Willis, dated October 30th, 1897, and
conveys land fronting on South street and abutting on one side
"in the middle of a new road fifty feet in width." And then
follows this clause:

"It is understood and agreed [the Headleys and Mrs. Willis] that the
fifty-foot road referred to in the above description is to be and remain
open as a road forever hereafter for the benefit of all parties interested."

Next is a conveyance dated April 1st, 1898, from the Headleys to Miss Dana. The lot thereby conveyed fronts on South street and runs the depth of the Dana lot, and mentions a stake at an angle in the northwesterly line of the "new road laid out across the whole tract called Headley road," and further contains a clause as follows: "The said Headley road to remain open and to be used as a public road by all persons desiring to use the same."

The next is a deed from the Headleys to Mary C. March, dated November 16th, 1898. The description in that conveyance refers to a new street "known as Headley road laid out across the whole tract." The Headleys especially

"covenant on behalf of themselves and their heirs and assigns not to erect or permit to be erected on the property now owned by them adjoining the March lot to the southwest and within 800 feet of the property conveyed, any house that shall cost less than $5,000 each or that will be nearer than 40 feet to the street line."

It also contains a restriction against building within forty feet of the street line by Mrs. March.

The next deed is to Mrs. Romaine, dated March 15th, 1899, and contained a like covenant to that of Mrs. March as to building within forty feet of the street line, and a covenant on the part of the Headleys not to build within forty feet of the line of the street for a space five hundred feet west of her line.

The next is a deed to Walsh, dated February 27th, 1899. This refers to the Headley road as laid out across the whole tract and conveys half the road in front of the land conveyed.

With regard to these two covenants in favor of Mrs. March and Mrs. Romaine, it is enough to say that they were covenants in favor of the two lots conveyed to those ladies respectively, and cannot by any proper construction be extended to any subsequent purchasers.

With regard to the declaration or agreement in the deed to Mrs. Willis, it covers only the road which adjoined Mrs. Willis' land.

With regard to the conveyances in which reference is made to a road laid out across the whole tract, it is quite plain that the draughtsman of those deeds had before him the Howell map,

which, as we have seen, includes only a part of the whole tract. The declaration—"said Headley road to remain open and to be used as a public road by all persons desiring to use the same"— can operate only in two ways—*first,* as a private covenant with the several grantees, in which no other person has any interest as an individual, and *second,* as a dedication to the public.

In neither aspect can Mr. Lidgerwood take advantage of it, since the public have never accepted the dedication.

But these several mentions of the Headley road—the map was never mentioned in any of the deeds—were undoubtedly the moving causes of the complainant out of abundant caution, making it a condition that he should have a release from these parties before he accepted his conveyance.

We come now to the deed to Mills. The description of the land conveyed found in that deed refers to the Headley road, but nowhere to any map. Then is found this clause:

"The parties hereto hereby agree that no dwelling-house or other building shall be erected on the lot above described or on the remaining land of the parties of the first part nearer than 40 feet to the northwesterly side line of Headley road aforesaid."

This clause was inserted in fulfillment of the clause on the subject found in complainant's contract of April 6th, 1903, as above quoted, and the deed to complainant subsequently executed in pursuance of it, which provided that such erection shall not be made on the lands of the Headleys.

It must be confessed that taken literally it restricts the building of a house within forty feet of the line of the Headley road on a part of the property covered by complainant's contract, if the Headleys were the owners of it at the time that the deed to Mills was delivered.

Good conveyancing required that the lands under contract to the complainant should have been expressly excepted in that deed. Mr. Headley swears that he executed the deed intelligently because he understood that the deed to the complainant was to be delivered prior to the deed to Mills. Judge Vreeland swears that he did not limit the scope of that covenant by taking back from Mr. Mills a contemporaneous declaration in writing

to that effect because he thought it was thoroughly understood by Mills, and I am of the opinion that he was justified in so supposing. But the precise effect of the deed in restricting the complainant's right to build is not involved in this suit, since it is not within the issue, which, as I read the pleadings, is confined entirely to a right of way, hence I shall express no opinion upon it.

I can find no language in Mr. Mills' deed which gives by implication any right of way over that part of the Headley road which is included in complainant's purchase. The only implication which can justly be raised therefrom is a right of way over Headley road to South street.

The right to drive or walk over the lower end of the road across the line of complainant's purchase is neither necessary nor convenient for the beneficial enjoyment of the lands conveyed to him. Further it will be observed that, unlike the deeds to Miss Dana, Mrs. March and Mrs. Romaine, the deed to Mills contains no language by which the extent of the road to the southwest can be determined. As in the other cases, there is no mention of a map.

But say counsel for Lidgerwood: The Headleys spoke of the road and a map was used. The road was visible on the ground for at least eighty-five feet within the limits of complainant's purchase, and on the map for over three hundred feet, and they claim that the Headleys are now estopped in equity, and so is the complainant as their grantee, from setting up that the road does not exist.

It is of the essence of equitable estoppel that the party setting it up must have so far acted upon it as that it would work injustice to him to permit the other party to retract his position. Now, I am unable to see how Lidgerwood will be injured in the least by the closing of this road as proposed by the complainant. The case is not only bare of any proof that he bought with a view of making any use of or deriving any benefit from the existence of the road at the point in question, or that he can possibly derive any benefit therefrom, but, on the contrary, it abundantly appears that the sole use that he expected to make of the road was to have access over it to South street.

I have said that the object of an estoppel is to promote justice. To set it up and enforce it in this instance would, in my judgment, work a gross injustice on the Headleys and the complainant, since it would simply give to Mr. Lidgerwood a right to injure them without benefiting himself or his land, except in so far as it gave him power to compel the parties to buy him off.

The result of the evidence is, first, that complainant had an oral contract for the purchase of his premises as early as the 21st of January, 1903, which as against third parties with notice of it was binding and valid; that it was crystallized by a written agreement, complete in all its parts, executed on the 7th of April, 1903; that Lidgerwood's agreement was perfected as a verbal agreement on the 4th of April and crystallized into what may be deemed a valid and binding agreement on the same day as the complainant's; that Lidgerwood's agent, Mills, had complete notice of complainant's agreement before he paid any money, and that a deed to complainant had been executed to his knowledge before he accepted his title and paid his money, and that therefore the complainant is first in time and is entitled to priority in equity.

Second, I find that the deed to Mills does not, either expressly or by implication, convey any right to him in the Headley road over the parts here covered by complainant's contract, and that the case not only does not warrant but forbids the raising of any estoppel in favor of giving Mr. Lidgerwood any right in the premises.

For these reasons, briefly stated orally at the hearing, and without commenting upon or very carefully examining the cases cited by the counsel for defendant, I advised the decree now under appeal.

I have since examined the authorities cited by counsel for Mr. Lidgerwood and find in them nothing to conflict with that result, except one or two cases in Massachusetts.

The judges of that state, in ascertaining the rights of parties arising under circumstances more or less similar to the present, early adopted the judge-made doctrine that the mention in the description of land in a conveyance of a street or road adjoining the same, amounted by implication to a positive and solemn

covenant, with all its characteristics and results on the part of the grantor that such a street did exist, and they applied that doctrine so far in one or two instances as to give the grantee an absolute right of way over the whole length and breadth of the street, whether such right was of the least benefit to him or not.

I have always conceived that the right in such a case was to be derived either from an implied grant of a right of way to the nearest public highway as in the nature of a right of way by necessity, or from an estoppel, which prevents the grantor from denying the existence of the road, where and so far as the doing so would injure the grantee, or that if a covenant was to be presumed it was to be confined in its operation and effect within such limits as the presumed intention of the parties and the very right and justice of the case required. The indisposition of our courts to presume a covenant in the strict sense of that word in such cases is manifested by the case of *Hopkinson* v. *McKnight, 31 N. J. Law (2 Vr.) 422.*

Let us look at some of the cases in our own reports relied upon by defendant. I pass over those which deal with the sufficiency of certain acts to affect a dedication to the public, since they have little or no application here.

In *Dill* v. *Board of Education, 47 N. J. Eq. (2 Dick.) 421* (where most of the cases up to that date, 1889, are collected), the claim was one for light and air over a lane immediately adjoining the lands of the complainant, so that there was no question as to the right of way in that lane at any point beyond its contact with complainant's land, and could be, therefore, no question as to a right of way in a *cul-de-sac* at a distance from complainant's lot. In fact there was no *cul-de-sac,* but the lane in question was part of a network of streets, all opening directly or indirectly upon recognized public highways.

So with the case of *White* v. *Tide Water Oil Co., 50 N. J. Eq. (5 Dick.)* 1. That was the case of an elaborate network of streets laid out on the official map of the city and connecting with public highways, so that the element of *cul-de-sac* did not exist.

Just here I will refer to the careful language of Chancellor Zabriskie in *Attorney-General* v. *Morris and Essex Railroad*

*Co., 19 N. J. Eq. (4 C. E. Gr.) 386*, where (at *p. 394*), in speaking of the effect upon the right of the individual abutters of the lawful vacation of a street once dedicated and accepted by the public, he says: "The purchaser of a lot upon a street so dedicated acquires a perpetual, *indefeasible right of access to his lot over the same or at least over so much as leads from his lot to the next adjoining public street on each side,* whether the same be accepted and adopted by the public as a highway or not, and retains it if, after acceptance, the same be abandoned by the public as a public highway." I conceive this to be an accurate statement of the law, and it fully recognizes the doctrine laid down by Chief-Baron Comyn above stated, namely, that each end of a private way must either be some public place or some private place where the occupant has some right to go.

To the same effect as Chancellor Zabriskie's statement is the well-considered opinion of Vice-Chancellor Van Fleet in *Dodge* v. *Pennsylvania Railroad Co., 43 N. J. Eq. (16 Stew.) 351,* adopted by the court of appeals in affirming his decree in *18 Stew. 366.* The case is too long for extensive citation, but refused to extend the right of way beyond the first street on each side of the complainant's lands, precisely in accordance with Chancellor Zabriskie's doctrine.

And I think it is quite consistent with what was said by Mr. Justice Depue in *Booraem* v. *North Hudson County Railroad Co., 40 N. J. Eq. (13 Stew.) 564.* There, in speaking of rights arising out of conveyances referring to streets, the learned judge speaks of the *implied right of access to the land.* He does speak of it as an implied covenant thus—"by such conveyances the grantees are regarded as purchasers by implied covenant of the right to the use of the street *as a means of passage to and from their premises*"—by which he means passage from some public place to and from their premises. And farther on he says "for a grantor may acquire an easement in lands conveyed by apt words in the deed to create such a right, which, by way of estoppel, covenant or implied grant will bind the grantee." But it is quite plain from this and other similar language used by other judges in this state in such cases that the implication arising under such circumstances, whether it be founded on implied

covenant or on estoppel, is confined to such use of the road or street as is necessary or useful for the beneficial enjoyment of the lot conveyed.

And, in general, the language used by the judges is that the right is to a right of way for access from some public highway to and from the premises conveyed.

No case in New Jersey or elsewhere that I have found, except in Massachusetts, presently to be mentioned, has gone so far as to hold that, in the present case, for instance, if the Headleys, after conveying the two lots on the corner of Headley road and South street to Mrs. Willis and to Miss Dana, had chosen to obliterate and close the street they had already worked in the rear of these premises, they might not have done so, provided it did not appear that such closing would work any injury to those grantees.

I will mention here the case of *Holdane* v. *Trustees of Village of Cold Spring, 21 N. Y. 474.* There the owners of a tract of land had laid out on the ground and fenced a strip of land for an avenue extending from one already opened across their lands to lands of one Morris, and there ending in a *cul-de-sac,* and had this street so laid out on the ground plotted and designated as a highway on a map of the village made and published by one Bethan. Years afterwards, and before any lots had been sold off from it, or there had been any acceptance by the public, the owners closed up the road and shut out the public. It was held by an unanimous court that the owners had the right to revoke their dedication at any time before the public accepted it, therein affirming the judgment of the supreme court, where two of the judges went on the ground that there could be no dedication of a *cul-de-sac,* and the others went on the ground that there had been no acceptance.

Another case cited by the defendants is *Bissell* v. *New York Central Railroad Co., 23 N. Y. 61.*

There the sole question before the court was whether the conveyance of land bounding on the side of a street laid out, but not yet accepted by the public, carried the title by implication to the centre of the street, and the court held that it did do so.

The facts were that one Morgan, owning one-half of a block of land in the city of Rochester surrounded by open streets, laid out through it a street called Erie street, cutting his land in two and ending in a *cul-de-sac* in the line of the owner of the other half of the square, who never continued it across his half. Morgan sold all the lots facing on this street, not including in the descriptions the street itself.

Subsequently the defendant acquired the title to all these lots and erected a building or buildings upon them, including the dedicated street. Subsequently Morgan conveyed his title to the bed of the street to the plaintiff, who brought ejectment to recover the land so conveyed to him. Judgment was given, reversing the supreme court, for the defendant, and it is difficult to see how it could have been otherwise. I come now to the Massachusetts cases.

*First. Tufts* v. *City of Charlestown, 2 Gray 271.* There the question arose upon the amount of damages to be awarded to the owner of the soil of a street proposed to be laid out by the city of Charlestown. It was, I believe, originally a *cul-de-sac,* but the only land granted out on the street extended to the whole depth of the street, so that the grantee had a clear right of way over the entire depth. It was held that the grantee had an interest in the whole length of the street, amounting to an easement, which reduced the value of the interest therein of the grantor, which should be taken into account in estimating the value of his interest. As the land conveyed bounding on the street extended to the full depth, the question here did not arise.

The next case is *Thomas* v. *Poole, 7 Gray 83 (1856).* There one Butters, the owner of a tract of land bounding on a public street, conveyed to the plaintiff a lot facing on this public street and on one side "upon a new street now staked out and to be opened by said Butters, thirty feet wide extending from said main street along on the northerly side of said lot hereby conveyed westerly to the land of the heirs of Dr. Luther Stearns, deceased."

The case does not show whether this staked-out street was

then or ever carried across the land of Stearns. Subsequently Butters altered the location of the street on the ground to the west of the plaintiff's land and sold to the defendant, an entirely innocent purchaser, a lot facing on it which included a portion of the street as staked out on the ground at the date of the plaintiff's purchase. The defendant proceeded to build upon his lot. The action was for damages for the obstruction of the street as staked out when the plaintiff bought. The court held that the plaintiff was entitled to recover, although by reason of the removal of the stakes the defendant had no knowledge or notice of the first location of the street. The decision was based on the doctrine of a hard and fast covenant on the part of the grantor of the plaintiff that a perpetual, immovable street existed at the point in question, although it did not appear that such existence at that particular point was or could be of the least benefit or advantage to the plaintiff or his land. To my mind, the judgment was unjust and inequitable, and not warranted by law. It was, in fact, carrying the doctrine of implied covenant to a mischievous extent.

The next case is *Rodgers* v. *Parker, 9 Gray 445 (1857)*. In that case the owner of the whole tract sold at auction by a map several lots lying on each side of a street called Hancock avenue, leading southwesterly from Hancock street (a public highway) to lands of Greenleaf, but whether extending through Greenleaf's land or not does not appear, but presumably it did not. The plaintiff was the purchaser of one of these lots nearest the open street, and annexed to his deed and recorded therewith was a copy of the map used at the auction.

The defendant bought a lot facing on the street in about the middle of it, and reference was made by his deed to the map recorded with plaintiff's deed. The plaintiff subsequently bought the lots lying on each side of this new street on the end next to Greenleaf's lands. One of those lots immediately adjoined the defendant's purchase. The plaintiff built a fence across the avenue at the extreme outer edges of his lots and immediately in front of the adjoining edge of defendant's lot. The defendant removed the fence. Plaintiff sued him in tres-

pass for tearing down his fence. The court held that the plaintiff had clearly, though slightly, so mislocated his fence as to interfere with defendant's ·right of way in the street immediately in front of his lot, and therefore the defendant was justified in removing the fence. But the court went further and held, on the authority of the previous cases in that state and the doctrine of hard and fast covenant before referred to, that the defendant was entitled to have the street as laid out on the map kept open to its full depth. The case in its facts is distinguishable from the one in hand, first, in that paper the street there extended entirely across the original grantor's land, and it might be said that peradventure the adjoining owner would at some time be willing to have it extended across his land to some public highway, while in the present case the road ended in the midst of the grantor's land.

And second, that the map was referred to in defendant's deed and, so to speak, made a part of the conveyance, while here it is not so referred to.

Third, the plaintiff proposed to close the street up to a point immediately in front of the side of the defendant's lot instead of two hundred and fifty feet away from it, as in the present case.

But over and above those distinctions, I cannot bring my mind to acquiesce in the soundness of its doctrine. I think it carries the doctrine of implied covenant beyond what is warranted by reason or justice.

I have taken the trouble to look through the subsequent Massachusetts reports to ascertain how far the doctrine of the two cases just mentioned has been approved and followed in the subsequent decisions.

In the case of *Stetson* v. *Dow, 16 Gray 372,* the way mentioned extended from one street to another.

In *Fox* v. *Union Sugar Refinery, 109 Mass. 292* (cited by defendant's counsel), the passageway over which the right of way was claimed led from one street to another street, so that, as in the case in *16 Gray,* there was no question of a *cul-de-sac.*

In the prior case of *Light* v. *Goddard, 11 Allen 5,* which is

later than *Rodgers* v. *Parker* and *Thomas* v. *Poole,* the court refused to extend the doctrine of implied covenant as far as it had been done in those two cases, and Chief-Justice Bigelow (at *p.* 7) says: "In these and similar cases it is regarded as a question of intent, and as ways or streets adjoining land and by which it is bounded are usually appurtenances, or used to *obtain access to the land,* the inference is a reasonable one that the grantor intended that the street or way named in the deed should continue open and be for the use of the grantee, so far as it might be beneficial to the estate granted and was within the power of the grantor to convey." And again, on *p.* 8: "We are by no means prepared to adopt as a sound rule of exposition the general proposition on which the argument for the plaintiff rests. We do not think that a mere reference to a plan in the descriptive part of a deed carries with it by necessary implication an agreement or stipulation that the condition of land not adjacent to, but lying in the vicinity of, that granted, as shown on the plan, or the use to which it is represented on the plan to be appropriated, shall forever continue the same, so far as it may be indirectly beneficial to the land included in the deed and was within the power or control of the grantor at the time of the grant."

In *Tobey* v. *City of Taunton, 119 Mass. 404,* Tobey was the owner of a lot on the corner of Main and Prescott streets, in the city of Taunton, which last-named street that city proposed to lay out and widen, taking in a portion of what Tobey claimed to be his land. The city claimed that that portion was within the limit of Prescott street, as mentioned in a deed by Tobey's grantor to a party bounding on Prescott street in the rear of Tobey's land. Manifestly it has no application here.

In *Killion* v. *Kelley, 120 Mass. 47,* there was a dispute between several owners of lots bounding on a court and an owner of the lot on the corner of the court and the main street.

*Williams* v. *Boston Water Power Co., 134 Mass. 406,* was a case in which the purchaser claimed as a logical result of *Thomas* v. *Poole* and *Rodgers* v. *Parker,* that he had a right to light and air over a piece of land shown on the plot by which he purchased, but the court refused to carry the doctrine that far.

The next case is *Regan* v. *Boston Gas Light Co., 137 Mass. 37.* There the plaintiff bought a lot by a plan showing a great number of streets. Justice Morton (at *p. 41*) says: "These deeds undoubtedly give the plaintiff a right of way over the streets named in them, namely, Commercial and Union streets, *so far as to furnish him with a communication with the public streets with which they connect.* This right is not questioned, but they refer · to the plan merely for the purpose of description and identification of the lots conveyed, and do not either expressly or by implication annex to those lots a right of way over all the streets laid down on the plan," and on *p. 42* he says: "The reference to the plan in the deed by the grantor was merely for the purpose of description and boundary and not with the intent to convey by implication *remote rights of way not necessary to the enjoyment of the premises conveyed."* And again, on *p 43:* "What is the purpose and effect of a reference to a plan in a deed is a question of the intention of the parties. In the absence of an express grant, a grant by implication of an onerous servitude upon other lands of the grantor not necessary for the enjoyment of the land conveyed, is not to be presumed unless such is clearly the intention of the parties."

In *Coolidge* v. *Dexter, 129 Mass. 167,* it was held that "a mere reference to a plan in the descriptive part of a deed of a lot of land does not import a stipulation by the grantor that the plan shall not in any respects be subsequently changed in parts not adjacent to the land sold." And finally, in *Pearson* v. *Allen, 151 Mass. 79,* the court refused to give to the complainant a right of way over an avenue plainly laid down on a map by which he bought, because it did not lead to any public street. The court says: "The cases here and elsewhere show that there are limits to the easements raised by way of implication even if there are not limits to the power of creating easements when it is attempted by express words."

While these cases do not expressly overrule the cases cited above, they do seem to me plainly to limit their effects as precedents.

If we inquire what was the intention of the parties to the

deed to Lidgerwood with regard to the use of that part of Headley road here in question, we shall find that it was not the intention of the Headleys to grant to Lidgerwood any right in that part of the road, and that Lidgerwood could not have supposed that such was their intention because he had notice through his agents, Mr. Mills and his brother, that the Headleys had no such intention. And if we inquire what beneficial use to Lidgerwood's lot such a right of way would be we find absolutely none.